# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOSEPH NEEDHAM,                                    Case No. 1:19-cv-1081
     Plaintiff,                                 Litkovitz, M.J.

vs.

COMMISSIONER OF                                    **ORDER**
SOCIAL SECURITY,
     Defendant.

Plaintiff Joseph Needham brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and

supplemental security income (SSI).  This matter is before the Court on plaintiff's Statement of

Errors (Doc. 15) and the Commissioner's response in opposition (Doc. 16).

## I.  Procedural Background

Plaintiff filed his applications for DIB and SSI on November 10, 2013, alleging disability

since July 16, 2013 due to herniated discs.  (Tr. 125).  The applications were denied initially and

upon reconsideration.  Plaintiff, through counsel, requested and was granted a *de novo* hearing

before administrative law judge (ALJ) Christopher Ambrose on April 19, 2016.  (Tr. 80-124).

ALJ Ambrose concluded that plaintiff was not under a "disability" within the meaning of the

Social Security Act (Tr. 201-12), but the Appeals Council subsequently vacated and remanded

his decision (Tr. 219-23).

Plaintiff and a vocational expert (VE) appeared and testified at the hearing on remand

held by ALJ Kristen King on January 19, 2018.  (Tr. 43-79).  On December 5, 2018, ALJ King

issued a decision denying plaintiff's applications. (Tr. 12-22). Plaintiff's request for review by the Appeals Council was denied on October 22, 2019, making ALJ King's decision the final decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B.  The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2018.

2. [Plaintiff] has not engaged in substantial gainful activity since July 16, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe combination of impairments best described as: degenerative disc disease (DDD)/degenerative joint disease (DJD) of the cervical, thoracic, and lumbar spines with a history of radiculopathy and reported neuropathy, morbid obesity with some related joint pain, mild light shoulder down sloping of the acromion laterally with mild outlet impingement, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

3

CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, [the ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: he can only occasionally push/pull within lifting restrictions. He can never operate foot controls. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can never reach overhead with the right upper extremity and he can occasionally reach overhead with the left upper extremity. He must avoid all use of dangerous machinery and all exposure to unprotected heights. He is limited to simple, routine tasks. He is able to perform goal-oriented work, but no constant production rate pace work, such as an automated assembly line. He is limited to a static work environment, which is defined as jobs in which changes occur no more than approximately 10% of the workday. He can interact with the public no more than approximately 10% of the workday, but no transactional interaction, such as sales or negotiations. He can have only occasional interaction with coworkers and supervisors.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. [Plaintiff] was born [in] . . . 1979 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P. Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

---

[1] Plaintiff's past relevant work was as an electronics technician, which is a skilled position with a medium level of exertion (SVP 7). (Tr. 30, 534).
[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled occupations with a light level of exertion such as photocopy machine operator (48,000 jobs in the national economy)

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from July 16, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-31).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the

---

(SVP 2); mail clerk (75,000 jobs in the national economy) (SVP 2); merchandise marker (110,000 jobs in the national economy) (SVP 2); and weight recorder (50,000 jobs in the national economy) (SVP 2). (Tr. 31, 72). The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as inspector (50,000 jobs in the national economy) (SVP 2); copy examiner (45,000 jobs in the national economy) (SVP 2); document specialist (70,000 jobs in the national economy) (SVP 2); and addresser (36,000 jobs in the national economy) (SVP 2). (Tr. 31, 73).

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

Plaintiff first alleges that the ALJ erred at step two of the sequential evaluation process by failing to consider primary headache disorder and traumatic brain injury with cognitive impairment as medically determinable and severe impairments and by failing to consider these impairments in assessing plaintiff's RFC.  Plaintiff next argues that the ALJ erred at step three of the sequential analysis by failing to evaluate, consistent with the Appeals Council's remand instructions, whether his lumbar or cervical spine impairments meet and/or equal the requirements of Listing 1.04.  Relatedly, plaintiff argues that a further medical expert opinion related to that Listing was warranted under the remand order.  Finally, plaintiff argues the ALJ should have assigned controlling weight to the opinion of treating physician Elizabeth Doriott, M.D.

### 1. Step two of the sequential evaluation process

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.  20 C.F.R. §416.920(c).[3]  Basic work

---

[3] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical . . . and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively."  *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n.1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th

activities include but are not limited to "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgement, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting."  SSR 85-28, 1985 WL 56856, at *3; *see also* 20 C.F.R. § 416.922(b).  A claimant is not required to establish total disability at this level of the sequential evaluation process.  Rather, the severe impairment requirement is a threshold element which a claimant must prove in order to establish disability within the meaning of the Act.  *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984).  An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience."  *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  The severity requirement is a "*de minimis* hurdle" in the sequential evaluation process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

Once a claimant clears step two of the sequential analysis, the ALJ "must then 'consider the limiting effects of *all* [the claimant's] impairment(s), even those that are not severe' in evaluating the claimant's ability to work in step four."  *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018) (quoting 20 C.F.R. § 404.1545(e)) (emphasis added).  An ALJ's failure to find an impairment to be severe does not constitute reversible error where the ALJ determined that a claimant has at least one other severe impairment and properly considered all

Cir. 2007)).  The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations, and vice versa, for purposes of this Order.

of the claimant's impairments, both severe and non-severe, in determining whether the claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). "The fact that some of [a claimant's] impairments [are] not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz*, 837 F.2d at 244).

### a. Primary headache disorder

Plaintiff argues that his migraine headaches are a severe impairment based on the numerous references to this condition in the record (*see* Doc. 15 at PAGEID 2146), the fact that he takes medications for migraines, his testimony that he suffers daily non-migraine headaches even with medication (Tr. 65) and was missing up to one day per week of work (Tr. 56-57), the lack of reference by the ALJ to his June 2015 brain MRI (Tr. 884), and the ALJ's characterization of his 2016 brain SPECT test[4] (Tr. 1917) as "generally normal" (Tr. 19). The Commissioner argues that substantial evidence supports the ALJ's conclusion that plaintiff's headaches are not a severe impairment.

The ALJ's determination that plaintiff's headaches are not a severe impairment is based on substantial evidence. First, the fact that the record documents a history of migraines and treatment for migraines does not, in and of itself, say anything about the impairment's *effect* on plaintiff's ability to work. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir.

---

[4] This is a single-photon emission computerized tomography scan, which is used to assess (as relevant here): dementia and head injuries. MAYO CLINIC, *SPECT scan*, https://www.mayoclinic.org/tests-procedures/spect-scan/about/pac-20384925#:~:text=Overview,to%20create%203%2DD%20pictures (last visited February 18, 2021).

2007) (mere existence of impairments does not establish that claimant was significantly limited from performing basic work activities for a continuous period of time); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (mere diagnosis of impairment says nothing about severity of the condition). Second, plaintiff's testimony about frequently missing work does not directly implicate his headaches as the sole cause of his absenteeism; rather, he alludes to migraines as one of several reasons for absences. (*See* Tr. 56-57) ("It was at least a complete day off almost every week, leave for physical therapy, aqua therapy, doctor's appointments. *Some days I had too big of a migraine* I couldn't even see straight.") (emphasis added). In any event, the ALJ acknowledged plaintiff's complaints of headaches but reasonably considered that plaintiff's neurological examinations of record have remained unremarkable. (Tr. 19). Plaintiff has not cited any contrary evidence to call into question the ALJ's finding in this regard. In addition, the ALJ noted plaintiff's testimony that he experiences migraines three to seven times a month, but his medications help manage the condition. (Tr. 22, 65). *See* 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3) (ALJ should consider "type, dosage, effectiveness, and side effects of any medication you take").

Plaintiff also argues that the ALJ failed to address his brain MRI, which showed some nonspecific abnormality that was "atypical for [plaintiff's age]" with "[p]ossible etiologies includ[ing] sequela from prior insult such as migraines [or] previous trauma, etc." (Tr. 884). However, plaintiff has failed to cite to any medical opinion interpreting the MRI findings as actually being related to his migraine headaches (or their severity), as opposed to another etiology. Plaintiff has shown no error in this regard.

9

Plaintiff further argues that the ALJ mischaracterized the brain SPECT test results as "generally normal" (Tr. 19), when in fact the test showed:

> 1. Decreased basal and perfusion-stimulated tracer distribution consistent with amnestic MCI [mild cognitive impairment], likely with mixed microvascular disease, and nonspecific neurodegeneration, such as normal aging, perhaps somewhat accelerated by prior [traumatic brain injury] and complex migraines.

> 2. Decreased FRi, consistent with increased stroke risk slightly less than average diabetics with FRi near zero and, in our experience, approx. 12% risk of minor stroke by age 52 years.

(Tr. 1917).  Plaintiff alleges that this brain SPECT test confirms the existence of his migraine headaches.

It is undisputed that plaintiff has migraine headaches.  The issue, however, is whether these impairments are severe.  As noted by the ALJ, plaintiff's neurological examinations have remained unremarkable, and the record demonstrates that plaintiff's migraines are managed with medication.  (Tr. 19) (citing Tr. 921, "given Imitrex for Migraines by PCP and has had some relief. . . .").  Plaintiff also testified that medication "dulls [migraines] down to where it's, instead of being a, going from a headache to a migraine it stays in the headache-ish area.  It doesn't cross into the migraine and stay there which is a lot easier for me to handle."  (Tr. 65).  Plaintiff has not pointed to any treatment records or medical opinion evidence that show his headaches cause functional restrictions in addition to those already found by the ALJ.  The ALJ's determination that plaintiff's migraines are not a severe impairment is based on substantial evidence.

Even if the ALJ erred in failing to characterize plaintiff's primary headache disorder as a severe impairment, any such error would be harmless.  The ALJ found plaintiff suffers from

several severe physical and mental impairments, proceeded with the remaining steps of the
sequential evaluation process, and ultimately addressed all of plaintiff's impairments in
determining his residual functional capacity.  *Maziarz*, 837 F.2d at 244.  Plaintiff contends his
migraines "could be reasonably expected to produce difficulty in maintaining persistence, pace,
and attendance at work activity" and would cause absenteeism.  (Doc. 15 at PAGEID 2148-49).
The ALJ, however, specifically accounted for plaintiff's difficulties with concentrating,
persisting, or maintaining pace by limiting plaintiff to simple, routine tasks with no constant
production rate pace work in a static work environment.  (Tr. 22).  The ALJ thorough considered
the medical evidence as a whole and, despite evidence to the contrary showing plaintiff did not
have  difficulty with memory, attention, or concentration (*see, e.g.*, Tr. 26, Tr. 575-76, 921-22),
nonetheless imposed RFC restrictions to accommodate plaintiff's alleged limitations in
concentration, persistence, and pace.  (Tr. 26, 29).   Moreover, as discussed above, plaintiff's
testimony does not support the conclusion that his migraines directly caused his absenteeism—
particularly as his testimony appears to discuss only unmitigated (unmedicated) migraines.
Plaintiff has not shown that even if the ALJ was bound to find his primary headache impairment
is in fact severe, that impairment imposes additional functional limitations which the ALJ failed
to include in the RFC finding.  Because plaintiff has not shown that the record supports the
imposition of additional functional limitations to account for his headaches, any erroneous
assessment of this impairment as non-severe by the ALJ in this case would be harmless.  *See
Foster v. Bowen*, 853 F.2d 483, 488-89 (6th Cir. 1988) (relevant consideration in disability case
is not claimant's diagnoses, but whether impairments impose disabling limitations).

*b. Traumatic brain injury with cognitive impairment*

Plaintiff argues that the ALJ failed even to mention his cognitive complaints in her decision and therefore could not have considered them in connection with her residual functional capacity determination. He also argues that any questions the ALJ had about the brain SPECT test results should have been directed to a referring physician. The Commissioner responds that the ALJ's decision included detailed consideration of the record evidence related to plaintiff's mental performance, which made any further medical evidence related to the brain SPECT test unnecessary.

In July 2016, plaintiff consulted with neuroendocrinologist Harold Pretorius, M.D., due to an abnormal cortisol test and complaints of depression, dizziness, passing out, and short-term memory loss. (Tr. 1472). Dr. Pretorius ordered the brain SPECT test "for memory loss." (Tr. 1473). Following the SPECT test, plaintiff was seen for a follow-up appointment with Dr. Pretorius on August 15, 2016. Dr. Pretorius indicated that the SPECT test was "compatible" with a past traumatic brain injury. (Tr. 1271). At that time, Dr. Pretorius started plaintiff on Cilostazol and continued Donepezil. (*Id.*).

The ALJ acknowledged that plaintiff underwent a brain SPECT test and characterized its results as "generally normal" at step two of the sequential analysis, though she did not refer to "cognitive impairment" specifically.[5] (Tr. 19). To the extent plaintiff contends the ALJ erred by not finding a severe cognitive impairment based on the SPECT test, plaintiff has not shown the ALJ's decision is without substantial support in the record or more than harmless error.

---

[5] Cognitive impairment refers to trouble remembering, learning new things, concentrating, or making decisions affecting everyday life. Cognitive impairment ranges from mild to severe. *See* www.cdc.gov › aging › pdf › cogimp_poilicy_final.

12

The ALJ considered the record evidence of plaintiff's mental impairments and assessed plaintiff's functional limitations in the relevant four functional areas used to evaluate mental impairments, which included plaintiff's ability to: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  (Tr. 21).  *See* 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. Pt. 404, Subpart. P, App. 1, § 12.00 *et seq.*  The degree of limitation in these functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4)).  A rating of "none" or "mild" signifies an impairment is not severe.  20 C.F.R. § 404.1520a(d)(1).

The ALJ found that plaintiff has only a mild limitation in understanding, remembering, or applying information.  (Tr. 21).  Plaintiff does not challenge the ALJ's finding in this regard, which the ALJ based on plaintiff's December 2013 psychological testing showing plaintiff exhibited normal abstract reasoning skills and normal memory skills and on additional records documenting intact orientation and normal memory.  (Tr. 21, 26-27, 575, 921, 927, 1943, 1948). Perhaps more importantly, plaintiff also fails to identify any parts of the record that reflect specific limitations related to a cognitive impairment.  He says only that "[i]t is difficult to imagine that [Dr. Pretorius would have prescribed cognitive medications] in the absence of a significant memory/cognitive impairment. . . ."  (Doc. 15 at PAGEID 2148).  This is not evidence of limitations due to plaintiff's cognitive complaints.

In addition, even if the ALJ erred by not finding a severe cognitive impairment, the ALJ thoroughly considered plaintiff's mental impairments and limitations.  In addition to finding only mild limitation in plaintiff's ability to understand, remember, or apply information, the ALJ also

13

determined that plaintiff has a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting and managing oneself. (Tr. 21). In assessing plaintiff's mental RFC, the ALJ stated she imposed "a number of significant restrictions" to accommodate these limitations:

> The undersigned limited [plaintiff] to routine tasks with restrictions on changes and pace to further accommodate his mental impairment symptoms as noted in the treatment notes and other evidence of record. The reduced social demands, along with the reduced changes and pace limitations, should also allow [plaintiff] to better withstand work pressures, since the potential stress associated with more frequent and/or more involved interactions have been reduced, as has the stress from greater changes and pace demands. Overall, these limitations have been given because of the persuasive clinical findings, opinions, and other evidence regarding [plaintiff's] moderate limitations as discussed elsewhere, although such limitations have not always been discussed in function-by-function terms. The undersigned has also tended to be generous in finding greater restrictions as opposed to lesser restrictions along the spectrum of the moderate findings as to the B criteria.

(Tr. 29-30).

While plaintiff argues that the ALJ ignored his cognitive complaints, he fails to address the restrictions imposed by the ALJ to accommodate his moderate impairments in functioning. Nor has plaintiff cited to any other evidence suggesting additional restrictions the ALJ should have imposed in assessing plaintiff's mental RFC. The Court finds that the ALJ properly considered plaintiff's cognitive impairment in her residual functional capacity determination, regardless of whether the ALJ should have characterized this impairment as severe. *See Hedges*, 725 F. App'x at 395; *Anthony*, 266 F. App'x at 457 (improper designation of an impairment as non-severe at step two is legally irrelevant if other impairments are considered severe). The

14

ALJ's residual functional capacity determination in this regard is therefore based on substantial evidence and plaintiff's first assignment of error is overruled.

>   2. Listing 1.04

Plaintiff next argues that the ALJ failed to carry out the Appeals Council's remand order, which had identified the prior ALJ's failure to evaluate plaintiff's lumbar spine degenerative disc disease (including plaintiff's use of a cane) and directed the ALJ to reevaluate whether that impairment or his cervical spine impairment met or medically equaled the severity of Listing 1.04. [6]  The Commissioner responds that the ALJ relied on substantial evidence that plaintiff does not suffer nerve root compression that satisfies Listing 1.04(A) and that plaintiff does not otherwise meet the functional limitation requirements of Listing 1.04(A) or (C).

Listing 1.04 includes "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F. R. § 404, Subpart P, App. 1, Part A1.  As relevant here, the disorder must be accompanied by either:

>   A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
>   OR

---

[6] Plaintiff's arguments in this assignment of error relate to the ALJ's evaluation of his lumbar spine.  While he reiterates that the Appeals Council directed the ALJ to reexamine *cervical* spine findings (Doc. 15 at PAGEID 2149), he does not identify any specific issues with the ALJ's decision related to his cervical spine impairments. Any arguments related thereto are therefore waived.  *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.") (citation omitted).

15

. . .

    C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings
on appropriate medically acceptable imaging, manifested by chronic nonradicular
pain and weakness, and resulting in inability to ambulate effectively, as defined in
1.00B2b.

*Id.* In addition, the regulations require that the abnormal findings must be established over a

period of time: "Because abnormal physical findings may be intermittent, their presence over a

period of time must be established by a record of ongoing management and evaluation." 20

C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D.

    The Appeals Council's decision rested primarily on a May 2014 lumbar spine MRI,

which showed "nerve root impingement of the S1 nerve root ([citing Tr. 601-02)]." (Tr. 221).[7]

This same MRI also noted "[n]o evidence of right-sided nerve root impingement." (Tr. 601).

On remand, the ALJ found:

    [T]he record fails to show that [plaintiff] has the radiographic findings or
consistent neurological pathology required under Listing 1.04 which addresses
disorders of the spine with evidence of nerve root compression. . . . The [2014
lumbar spine MRI] revealed only slight budge of the L5-S1 disc with slight
posterior nerve root displacement ([citing Tr. 601, 1912]) and examination
findings at [plaintiff's] physical consultative examination just prior to such
findings showed [plaintiff] exhibited normal gait, did not require his cane to
ambulate, and was comfortable in both sitting and standing positions ([citing Tr.
582]). Spine curvature was normal and while extension of the spine was
diminished to 15 degrees, there was no evidence of paravertebral muscle spasm or
tenderness (*Id.*). Straight leg raise was also normal (*Id.*). At that time,
neurological examination was also absent muscle weakness or atrophy ([Tr. 583]).
He was described as obese and generally deconditioned and had a "dramatic
response" to most testing; however, no evidence of radiculopathy in either the
cervical or lumbar spines was observed. (*Id.*). Similarly, in January 2018, it was
noted that Dr. Borden reportedly did not find any credible evidence previously of
a spine injury or anatomic correlation of his symptoms to the 2014 lumbar MRI at

---

[7] While the Appeals Council's decision does not specify, the underlying record it relies on refers to only left-side
impingement.

issue and indicated that his examination strongly suggested that his symptoms
were exaggerated ([Tr. 1912]).

* * *

Notably, the lumbar MRI scan in 2017 was "totally normal" aside from DDD at
L5-S1 and left paracentral disc bulge that did not cause neural compression (*Id.*).
Updated examination findings dated January 2018 also note normal muscle bulk
and tone with no fascicultations or focal atrophy (*Id.* at 4[Tr. 1915]). Although
the [plaintiff] walked with a limp, he was not observed using a cane for
assistance. Tenderness in the midline lumbosacral junction was noted, but no
significant abnormality was documented (*Id.*). Similarly, an MRI of the cervical
spine later obtained in August 2018 showed no disc herniation or significant
central canal stenosis and only mild multilevel spondylosis with mild facet
arthropathy and neuroforaminal narrowing at multiple levels despite more
significant findings earlier ([Tr. 2076]). As such, the [plaintiff] does not satisfy
the requirements of Listing 1.04 given the longitudinal evidence of record.

(Tr. 19-20).

Plaintiff first argues the ALJ erred by not deferring to the Appeals Council's finding that

the 2014 "MRI was sufficient proof of the requisite nerve root impingement under Listing 1.04."

(Doc. 15 at PAGEID 2150). However, as the ALJ reasonably determined, the record as a whole,

including the longitudinal evidence, does not support a finding that plaintiff's impairments

satisfy the Listing 1.04 requirements. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D.

The 2014 lumbar MRI showed "[s]mall left paracentral herniation L5-S1 *slightly*

*impinging* on the left S1 nerve root" and "[n]o evidence of right-sided nerve root impingement."

(Tr. 601-02) (emphasis added). However, a 2016 lumbar MRI[8] showed a "left paracentral disc

---

[8] Plaintiff argues that the ALJ failed to consider this May 2016 lumbar spine MRI. (Tr. 1302-03). He argues that
the ALJ instead referred to a non-existent "lumbar MRI scan in 2017. . . ." (See Tr. 20). Review of the entire
decision makes clear, however, that the ALJ simply misidentified the date of this MRI. The description just
following the ALJ's reference to the "lumbar MRI scan in 2017" states that the lumbar MRI was "'totally normal'
aside from DDD at L5-S1 and left paracentral disc bulge that did not cause neural compression" (Tr. 20) (quoting
Dr. Schwetschenau, Tr. 1912), which is consistent with the May 2016 lumbar MRI record. (*See* Tr. 1302-03).
Further, the ALJ later specifically identifies and discusses the record containing the May 2016 lumbar MRI. (Tr. 25)
(citing Tr. 1303).

bulge" that "encroaches upon and contacts, *but does not compress the descending left S1 nerve root*. . . ." (Tr. 1303) (emphasis added). The ALJ reasonably relied on the later-in-time 2016 lumbar MRI and the other physical examination findings which failed to show the required neurological deficits for Listing 1.04A. Plaintiff does not counter the Commissioner's argument that the ALJ specifically pointed to the lack of evidence in the record regarding the functional limitations required under Listing 1.04(A). (*See* Tr. 20) (noting plaintiff's normal straight leg test and lack of muscle weakness or atrophy). Plaintiff is required to produce evidence that all of the criteria of Listing 1.04(A) are satisfied, which he failed to do. Plaintiff has not shown that the ALJ erred by failing to properly evaluate his severe back impairment under the criteria applicable to a spinal disorder. The ALJ's finding that plaintiff does not satisfy Listing 1.04(A) for disorders of the spine is supported by substantial evidence.

Plaintiff also argues that the ALJ should have consulted a medical expert to interpret the different findings in the 2014 and 2016 MRIs. (Doc. 15 at PAGEID 2151). "An ALJ's decision whether a medical expert is necessary . . . is inherently discretionary. There is no mandate requiring an ALJ to solicit such evidence." *Cunningham v. Comm'r of Soc. Sec.*, No. 1:13-cv-561, 2015 WL 4514540, at *7 (citing *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009)).

In this case, the ALJ reasonably relied on the interpretation of both MRIs by neurosurgeon Dr. Paul Schwetschenau. (Tr. 19-20, citing Tr. 1912). Dr. Schwetschenau reviewed the 2014 MRI scan, which showed "a slight bulge of the L5-S1 disc" and previous examination findings showing no "credible evidence of a spine injury or any anatomic

18

correlation of his symptoms to that MRI scan. . . ." (Tr. 1912). In 2014, plaintiff was examined by another physician in Dr. Schwetschenau's practice. At that time, it was noted "that his examination strongly suggested that his symptoms were exaggerated." (*Id.*). With respect to the 2016 MRI, Dr. Schwetschenau assessed the scan as "totally normal except for degenerative disease at L5-S1 and a left paracentral disc bulge that does not cause neural compression." (*Id.*). Given this evidence, the ALJ was not required to obtain another expert to re-interpret the findings of the 2014 and 2016 MRIs.[9]

Regarding plaintiff's use of a cane for purposes of Listing 1.04(C), he argues that the ALJ erroneously noted that "although [plaintiff] walked with a limp, he was not observed using a cane for assistance" at a January 2018 visit with Dr. Schwetschenau. (Tr. 20). It is true that Dr. Schwetschenau noted that plaintiff "use[d] a cane to get about, carrying it in his right hand and leaning on it heavily." (Tr. 1912). During that same visit, however, Dr. Schwetschenau noted on physical examination that plaintiff "[got] out of chair using arms[,] [and w]alk[ed] with a limp, leaning toward the right." (Tr. 1915). The ALJ also referred to a consultative exam performed a few months prior to the 2014 lumbar spine MRI, during which Dr. Jennifer Wischer Bailey observed that plaintiff "ambulate[d] with a normal gait using a cane" but "d[id] not require the cane to ambulate, and [was] able to cross the room easily without the cane again with an entirely normal gate." (*See* Tr. 20) (citing Tr. 582). The ALJ later referred to a November 2015 visit with Dr. Doriott, where she noted plaintiff's "normal gait and station" and "normal movement of all extremities." (*See* Tr. 29) (citing Tr. 945). The ALJ also observed that in August 2017, Dr.

[9] "Upon remand the [ALJ] will: . . . if necessary, obtain evidence from a medical expert related to . . . claimant's lumbar spine. . . ." (Tr. 222).

Doriott noted that plaintiff was "ambulating normally[,]" with "normal movement of all extremities" and "normal gait and station." (*See* Tr. 25) (citing Tr. 1510-11).

Listing 1.00B2b defines what the agency means by "inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.00B2(b). At subsection one, it explains that "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id.* at § 1.00B2(b)(1) (emphasis added). At subsection two, it explains that this includes "the inability to walk without the use of a walker, two crutches or two canes. . . ." *Id.* at § 1.00B2(b)(2). The ALJ specifically relied on medical records that showed plaintiff was able to ambulate with only one upper extremity limited, if an extremity was limited at all. The ALJ relied on substantial evidence to find that plaintiff's use of a cane does not satisfy Listing 1.04(C)'s requirement of an "inability to ambulate effectively." *See Jackson v. Comm'r of Soc. Sec.*, No. 07–14184, 2009 WL 612343, at *3 (E.D. Mich. Mar. 6, 2009) (the use of a single cane is inconsistent with the definition of "ineffective ambulation"). Plaintiff's second assignment of error is overruled.

### 3. Treating physician: Dr. Doriott[10]

Plaintiff argues that the ALJ improperly discounted Dr. Doriott's September 2015 opinion (Tr. 604-09) by giving it only "little weight." (Tr. 28). The Commissioner responds that substantial evidence supports the weight assigned by the ALJ because Dr. Doriott's opinion conflicted with her own contemporaneous records.

---

[10] Section 404.1527, which sets out the treating physician rule, has been amended for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. This amendment does not apply to plaintiff's claims, which he filed in 2013.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (citation omitted). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.") (citation omitted). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (citation omitted).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion "controlling weight," the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature, and extent of the treatment relationship and the frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the

medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting C.F.R. § 404.1527(c)(2)). This requirement exists so that claimants will understand the disposition of their cases, the ALJ will apply the treating physician rule, and the district court can conduct a meaningful review. *See Wilson*, 378 F.3d at 544-45 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) and *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)). An ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (quoting SSR 96-2p, 1996 WL 374188, at *5). There is no requirement, however, that the ALJ expressly consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (dismissing argument that an ALJ must address each of the regulatory factors in evaluating the opinion of a treating physician); *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("[T]he ALJ . . . is [not] required to discuss each piece of data in its opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion.") (citation omitted).

22

In September 2015, Dr. Doriott opined that plaintiff would be incapable of even "low stress" jobs.  (Tr. 605).  Dr. Doriott also found that plaintiff could sit for 0 minutes at one time and stand for 20 minutes at one time.  (Tr. 606).  According to Dr. Doriott, plaintiff would need to shift positions at will every hour and must use a cane or other assistive device.  (Tr. 607).  She also opined that plaintiff could frequently lift less than 10 pounds and occasionally lift 10 pounds.  (Tr. 608).  She opined that plaintiff could rarely twist, stoop/bend, or crouch; occasionally raise arms over shoulder level and engage in fine manipulation; frequently engage in gross manipulation; and never climb ladders and stairs.  (*Id.*).  Dr. Doriott also opined that plaintiff would have constant lapses of attention and concentration, and that he was likely to miss three days of work per month.  (Tr.  605, 609).

The ALJ gave little weight to Dr. Doriott's September 2015 opinion.  The ALJ determined:

> Dr. Doriott's assessment is inconsistent with the other evidence of record, as well as her own treatment records, which document normal neuro-musculoskeletal signs, including gait and station, in November 2015 (17F).  Subsequent MRI findings indicate no significant degeneration (27F/3, 40F/1, 48F/3) and no nerve impingement.  In addition, musculoskeletal and neurological examination findings have remained largely absent significant abnormality as discussed more fully above (5F/7, 26F/2, 30F/6, 41F/1 *for example*).

(Tr. 29) (record citations omitted).

Just prior to Dr. Doriott's September 2015 opinion, plaintiff saw Dr. Doriott to obtain a handicap placard in August 2015.  (Tr. 949).  Dr. Doriott's progress notes make no mention of a cane, and plaintiff reported "no back pain . . . no migraines, no headaches. . . ."  (Tr. 951).  On examination, Dr. Doriott reported that plaintiff had normal gait and station, normal movement of

23

all extremities, and normal ambulation.  (*Id.*).  In November 2015, Dr. Doriott's examination

revealed plaintiff had normal gait and station and normal strength, though she did note that he

ambulated with a cane.  (Tr. 945).  She found no tenderness and observed normal movement of

all extremities.  (*Id.*).

Plaintiff argues that the ALJ improperly relied on *only* Dr. Doriott's November 2015

treatment record in evaluating her September 2015 opinion.  He points to a later record of Dr.

Doriott from April 2016, which noted "poor tone[,] " "limited [range of motion,]" and the

inability to ambulate without a cane.  (Tr. 1525-26).  Plaintiff also cites numerous progress notes

showing abnormal musculoskeletal and neurological findings throughout the record from other

medical providers.  (*See* Doc. 15 at PAGEID 2153).  Dr. Doriott's April 2016 record, however,

also notes plaintiff's normal neurological functioning, normal gait and station, normal motor

strength, and lack of tenderness.  (Tr. 1525-26).  As it relates to the long list of other records that

plaintiff argues are consistent with Dr. Doriott's September 2015 opinion, only Dr. David Bryant

appears to have consistently found musculoskeletal abnormalities.  (*See* Tr. 585-602).  All of the

other records cited by plaintiff note only use of a cane and/or antalgic gait without other

abnormalities noted, with the exception of two records dated well-after Dr. Doriott's September

2015 assessment.  (*See* Tr. 1395, Dr. Zeeshan Tayeb, M.D., noting "[straight leg raise] bilateral

[lower extremity] [and] [d]ecreased [range of motion] L-spine" in June 2016; and Tr. 1948,

Dominique Shields, C.N.P., noting diminished strength in upper and lower extremities, "limited

[range of motion] to neck and right arm[, and] [t]enderness with palpation of lumbar spine" in

May 2018).

The ALJ's decision to discount Dr. Doriott's September 2015 opinion is supported by good reasons and based on substantial evidence. "Discounting a treating physician's opinion based on inconsistent contemporaneous treatment notes is appropriate." *Ramsey v. Comm'r of Soc. Sec.*, No. 3:16-cv-2208, 2018 WL 656029, at *7 (N.D. Ohio Feb. 1, 2018) (citing *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 177 (6th Cir. 2009)). *See also Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (holding it appropriate to discount a treating physician's opinion where the "proposed limitations were inconsistent with [the physician's] own treatment notes from the relevant period"). The ALJ further identified substantial evidence in the record that was inconsistent with Dr. Doriott's assessment. (Tr. 29) (citing, e.g., Tr. 577-84 (2014 consultative examination finding primarily normal musculoskeletal and neurological findings and noting that plaintiff "seemed to have a dramatic response to most of the testing, complaining of severe pain with light touch") and Tr. 1912 (2018 visit record from Dr. Schwetschenau noting no significant spine injury notwithstanding some mild spine MRI findings)).

Finally, plaintiff makes a passing reference to what seems to be the balance of the treating physician analysis (20 C.F.R. §§ 404.1527(c)(2)-(6)) at the close of his brief, stating "even if given only deference, Dr. Doriott had been the claimant's treating primary care physician for over a year at the time of this assessment, seeing the claimant on a regular basis." (Doc. 15 at PAGEID 2153). Without any developed argument on this point, however, the Court deems it waived. *See Kuhn*, 709 F.3d at 624. Plaintiff's third assignment of error is overruled.

25

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is

**AFFIRMED** and this matter is **CLOSED** on the docket of the Court.

Date:    3/4/2021

Karen L. Litkovitz
United States Magistrate Judge

26